IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Coprez Coffie, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 6745 |
| | ) | |
| Officer Scott Korhonen and | ) | |
| Gerald Lodwich, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR NEW TRIAL

JAMES F. HOLDERMAN, Chief Judge:

On October 16, 2007, a nine-member jury returned a verdict finding that defendant Chicago

Police Officer Scott Korhonen violated plaintiff Coprez Coffie's fourth amendment right to be free

from unreasonable searches by inserting a screwdriver into Coffie's rectum after an arrest of Coffie

on August 28, 2004. The same jury also found that defendant Chicago Police Officer Gerald

Lodwich, Korhonen's partner, failed to take reasonable steps to stop Korhonen from engaging in the

unreasonable screwdriver search of Coffie's rectum [390].

While the jury was deliberating, the parties agreed and stipulated that, if the jury found in

favor of Coffie on his claim against Korhonen, then Coffie would be entitled to $4,000,000 in

compensatory damages plus an award of attorneys' fees of $675,000 [388]. (Trial Tr. vol. 10,

6:12-23.)[1] After the jury returned its verdict in favor of Coffie, pursuant to the parties' stipulation,

I, as the presiding trial judge, entered judgment on the verdict for the stipulated amount of damages,

fees and costs [389].

---

[1]Citations to the trial transcript are made to the transcript volume, page and lines of the
cited testimony, argument, or court rulings where appropriate.

## I. Korhonen and Lodwich's Post-Trial Motion

In Korhonen and Lodwich's post-trial motion [393], they have not argued that the evidence was insufficient to support the jury's verdict in favor of Coffie. They also have not argued that I erred in any manner with regard to the instructions to the jury on the law. Consequently, in considering the defendants' post-trial motion, I will review the case in this post-trial opinion from the standpoint that the jury was properly instructed and had sufficient evidence to return the verdict in favor of Coffie, as it did.

Korhonen and Lodwich's five post-trial arguments relate to certain rulings that I made in the case as follows: (1) not removing for implied bias one of the nine jurors, Gladious Carter, who consistently and credibly stated she could be fair; (2) not allowing treating physician, Dr. Scott Yilk, to provide the jury certain cumulative opinion testimony that had not been timely disclosed during discovery; (3) not allowing evidence to be introduced regarding Coffie's prior arrest that had not resulted in a conviction; (4) requiring all trial counsel to minimize prejudice to the plaintiff with the use of the term "illegal drugs" or "controlled substance" instead of the term "heroin" in describing the crime to which Coffie had pleaded guilty following Coffie's arrest and the unreasonable search of Coffie's rectum by Korhonen on August 28, 2004; and (5) granting Coffie's pretrial motion to bifurcate the issues of liability and damages for trial.

Korhonen and Lodwich in their post-trial motion also seek leave to submit evidence of what they now assert to be dishonesty on the part of an unnamed juror during voir dire in the case.

A district court may grant a new trial if the verdict is against the manifest weight of the evidence—which this verdict is not—or if during the trial prejudicial error occurred. *Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 480 (7th Cir. 2000); *Romero v. Cincinnati, Inc.*, 171 F.3d 1091, 1096 (7th Cir. 1999). When a motion for a new trial is predicated on a purported error

of law, the moving party must show that the error was substantial enough to deny that party a fair trial. *Perry v. Larson*, 794 F.2d 279, 285 (7th Cir. 1986). None of Korhonen and Lodwich's arguments meet this standard, and none, individually or collectively, warrant a new trial. Korhonen and Lodwich's Motion for New Trial and for Leave to Submit Evidence of Juror Dishonesty During Voir Dire [393] is denied in its entirety for the reasons set forth below.

## II. The Facts

Before the trial commenced, the parties stipulated and agreed to three uncontested facts:

> 1. On August 28, 2004, Plaintiff Coffie was arrested by Defendants Korhonen and Lodwich, after which he was taken to the Cook County Jail that same day.
> 2. Plaintiff Coffie was released from custody of the Cook County Jail on August 30, 2004.
> 3. On August 30, 2004, at approximately 7:00 p.m., Plaintiff made a report of an injury to his buttocks area at the emergency room at St. Nazareth Hospital.

(Trial Tr. vol. 1-A, 26:21-22.)

The parties' "Agreed Statement of the Case," which was read to the venire during jury selection, presented to the jury the divergent factual positions of the parties. It stated as follows:

> On August 28, 2004, the Plaintiff in this case, Coprez Coffie was arrested by the Defendants in this case, Chicago Police Officers Scott Korhonen and Gerald Lodwich, for possession of a controlled substance.
> The Plaintiff alleges that during the course of the arrest, the Defendants handcuffed him and drove him to an alley, where they took him out of their car, pulled down his pants, and then inserted a screwdriver into his rectum.
> The Defendants contend that they drove plaintiff directly to the police station, and specifically deny that they drove Plaintiff to an alley, deny they took him out of the car, deny that they pulled down his pants, and deny that they inserted a screwdriver into his rectum.

(Trial Tr. vol. 1-A, 30:7-22.)

Considering all the evidence, which is now conceded by the defense to be sufficient to support the jury's verdict for the plaintiff, including the circumstantial evidence, which strongly supports the jury's verdict for Coffie, this was a clear case. The evidence established by a

preponderance of the evidence each of Coffie's claims that Korhonen unreasonably inserted a screwdriver in Coffie' rectum in violation of Coffie's constitutional rights and that Lodwich knowingly failed to stop Korhonen's unconstitutional conduct. In addition, the evidence clearly showed that Korhonen and Lodwich each knowingly testified falsely at the trial.

I now turn to address the issues raised in Korhonen and Lodwich's post-trial motion.

### III.  Juror Gladious Carter

During jury selection, after counsel for both sides and the respective parties, including Coprez Coffie, were introduced (Trial Tr. vol. 1-A, 107-108), the court asked the venire:

> All right.  Folks, do you know any of these people that you've just been introduced to?  Any of the lawyers or any of the parties?  If you do or you think you might, please raise your hand.

(Trial Tr. vol. 1-A, 108:5-8.)  Only one prospective juror, who was not selected to be on the jury, raised his hand.  Gladious Carter did not raise her hand.

When counsel for each side asked the prospective jurors questions, they each could have asked the prospective jurors further questions about any past contact with any of the parties. Counsel did not so inquire.  Mr. Platt, counsel for Korhonen and Lodwich, individually questioned Ms. Carter.  Among other questions, such as where in Chicago she lived, Mr. Platt asked:

> MR. PLATT:    Is there anything about what you know about this case so far that you think would affect your thinking as to whose side you might be on?
>
> PROSPECTIVE JUROR CARTER:  No.
>
> MR. PLATT:  You would treat all the parties fairly?
>
> PROSPECTIVE JUROR CARTER:  Right.

(Trial Tr. vol. 1-A, 131:8-13.)

After a recess and the sidebar-questioning of another prospective juror who was not selected, Mr. Platt further individually questioned Ms. Carter.  (Trial Tr. vol. 1-A, 149-151.)  He inquired

about her four children.  Mr. Platt had the opportunity to question Ms. Carter individually on any other pertinent point that he desired.  After counsel for both sides had a full opportunity to question each prospective juror, counsel for each side exercised all three of their respective peremptory challenges and the jury was selected, which included Gladious Carter.  (Trial Tr. vol. 1-A, 153.)

I then asked counsel at the sidebar outside the venire's presence:  "Anything else we need to take up before we go out and announce the jury?"  Mr. Platt responded, "No, Judge."  (Trial Tr. vol. 1-A, 155:12-15.)  The names of the jury members were then read in open court, completing the jury selection phase.  The trial then recessed for lunch.

After lunch, in addition to addressing other items with counsel, outside the jury's presence, I stated as follows:

> I have received a memorandum from my executive law clerk, who received information from Linda Rudolph, who is the head of the jury department.  I have made copies of that memorandum, as it was handed to me, and provided it to counsel.
>
> It states as follows.  It's from my executive law clerk to me.  It's regarding the jurors in Coffie v. City of Chicago.
>
> Now, on that point, on the "City of Chicago" point, I have made this case an individual versus two individuals.  That's what this trial is.  City of Chicago is part of the case but is not part of this trial, but the caption of the case is "Coffie versus City of Chicago."
>
> The memo states as follows:  "At 12:20 today, Linda Rudolph came to chambers to report a conversation she had with one of the jurors selected to serve in Coffie v. City of Chicago.
>
> "After being released for the lunch break, Juror Patrice Olson approached Linda in the jury room on the second floor and said that she wanted to speak with Linda in private.  Ms. Olson was accompanied by another juror who was also selected to serve in Coffie.
>
> "Once the three of them were alone, Ms. Olson related that at some point after the names of the selected jurors were announced, the African-American woman sitting next to her made the statement, 'I think I know the plaintiff, but I can't say from where.'  This statement was not made to anyone in particular.
>
> "Ms. Olson thought someone should know about this comment, so she reported it to Linda."
>
> That's the end of the memo.  The reason she would report it to Linda, Linda is, of course, the person that greets the jurors in the morning when they come in, new

jurors, as these people are, when they arrive at the jury room at 8:30 in the morning. Linda is the one in charge, so that's why this lady would go to Linda Rudolph.

Any comments, questions, thoughts?

MR. LOEVY: Your Honor, I have spoken to my client, and he's quite sure he's never met this woman in his life.

It's possible they were misheard, and, you know, at the very least, we'd say no action is justified.

THE COURT: All right. Well, the African-American lady who sits next to Patrice Olson or sat next to Patrice Olson during the voir dire is Gladious Carter.

MS. KENDALL: Well, Judge I think out of an abundance of caution, it would be appropriate for her to be further questioned to determine how strong of a belief that she has.

THE COURT: Okay. Why don't we bring Gladious Carter into the courtroom.

(Trial Tr. vol. 1-A, 170-171.)

Ms. Carter was brought individually into the courtroom in the presence of the parties and

their counsel. The other jurors remained in the jury room, and the following was said:

(Prospective juror in.)

THE COURT: All right. Please come on in, Ms. Carter. If you could take a seat in the first chair of the jury box. I will let the lawyers step back from the podium and have a seat at their counsel table as well.

Thank you, Ms. Carter. We appreciate your coming in early to the courtroom.

The question came up that you may, after spending the morning here in the courtroom, may have recognized the plaintiff from somewhere else. Is that correct or not?

PROSPECTIVE JUROR CARTER: Yeah, it seemed as though I could remember him from somewhere.

THE COURT: Okay. All right. Well, let me just ask you, remembering him from somewhere, would that cause you to not be able to be a fair and impartial juror in this case?

PROSPECTIVE JUROR CARTER: No.

THE COURT:  Okay.  So you still think, even though you remember him from somewhere, you still think you could be fair and impartial?

PROSPECTIVE JUROR CARTER:  Oh, yeah.

THE COURT:  Okay.  Let me also ask, do you remember where?

PROSPECTIVE JUROR CARTER:  It'd been some – quite a while.  I think he came on during the years with my children, my grandchildren growing up.

THE COURT:  Okay.  Let me say this.  The plaintiff may look like someone, but you're pretty sure it was the plaintiff as opposed to somebody that might have looked like him?

PROSPECTIVE JUROR CARTER:  I'm pretty sure it was him.

THE COURT:  Okay.  I am going to ask you, then, to put out of your mind whatever else you remember from that earlier occasion and consider this case as a juror in the case based upon the evidence presented here.
Do you think you could do that?

PROSPECTIVE JUROR CARTER:  Yes.

THE COURT:  And you can remain fair and impartial and listen to the evidence, keep an open mind, evaluate the evidence, and return a fair verdict?

PROSPECTIVE JUROR CARTER:  Yes.

THE COURT:  Okay.  All right.  Any questions by counsel?

MR. LOEVY:  Not from the plaintiff, Your Honor.

THE COURT:  Any questions by defense counsel?

MS. KENDALL:  Not for the witness, Your Honor.

THE COURT:  All right.  Thank you.
Thank you very much, Ms. Carter.  We will be right back with you shortly, and we will get started with the case, all right?  Thank you.

(Trial Tr. vol. 1-A, 172-173.)

As the transcript reflects, defense counsel was given the opportunity to question Ms. Carter and develop a basis for a challenge for cause. Defense counsel declined to do so. (Trial Tr. vol. 1-A, 173:21.)

It was apparent that Ms. Carter had some recollection that was jogged as she recalled vaguely having seen Coffie before. Regardless of whether her memory was accurate or not that she had had some prior contact with Coffie, she stated credibly that she could still be fair. She, therefore, remained on the jury, and I told counsel, "If you want to revisit it we can voir dire her later on." (Trial Tr. vol. 1-A, 178:25-179:1.) The trial commenced.

Four days later, on October 5, 2007, at the beginning of the afternoon session of the trial, the following occurred outside the presence of the jury:

> THE COURT: Good afternoon.
> Are there any matters we need to take up before we bring in the jury?
>
> MS. KENDALL: Judge, we just have one briefly. We just wanted to make the Court aware that I think just before the case started we had some questions of one of the jurors, Gladious Carter.
>
> THE COURT: Okay.
>
> MS. KENDALL: And we, at I think, sometime – maybe after the close of the plaintiff's case – would just like to maybe requestion her to see if whether, now that she has seen the plaintiff and heard his background, whether she knows one way or another whether she knows him.
>
> THE COURT: Okay.

(Trial Tr. vol. 5, 82.)

At the end of the court session that day, October 5, 2007, after the jury had been excused for the weekend, I asked my clerk to ask Ms. Carter individually to come into the courtroom, and the following transpired:

> (Brief pause. Juror Carter enters.)

THE COURT: Thank you, Ms. Carter. Come on in. We don't want to delay you, but go ahead and have a seat.

As you are going to your seat, as you remember, you had told us early on about - - go ahead and have a seat. You can sit in the first chair. It's probably easier.

You told us early on about your having contact or believing you had contact with Mr. Coffie before. As the trial has worn on, do you have any change in your view?

JUROR CARTER: No.

THE COURT: All right.

Let me also ask, have you recalled anything further as to what the contact was?

JUROR CARTER: I believe it was at the Hyatt Regency when he was a security guard.

THE COURT: All right. When he was security at the Hyatt Regency?

JUROR CARTER: Yeah.

THE COURT: Okay. What contact do you - -

JUROR CARTER: I remember faces very good.

THE COURT: Okay. And you think you ran into him at some point at the Hyatt?

JUROR CARTER: Yes.

THE COURT: All right.

Is there anything about that contact that you had with him at the Hyatt that would make you believe that you could not be a fair and impartial juror in this case?

JUROR CARTER: Oh, no.

THE COURT: Okay. Could you tell us any more about that contact at the Hyatt that you recall now?

JUROR CARTER: It's been quite awhile.

THE COURT: Do you want some water?

I will get her water. That's all right.

When a juror wants water, everybody wants to give her water.

(Laughter.)

THE COURT: Here you go.

The reason I asked Ms. Carter about the water is her voice, like mine, is a little froggy.

Take a moment.

Now tell us, what is it that you recall about that?

JUROR CARTER: We seniors, we go to luncheons down there sometimes during the year. And I can't recall, but I remember his face from being there.

THE COURT: Okay.

Did you ever talk with him?

JUROR CARTER: Oh, no. I just remember his face.

THE COURT: You remember his face.

JUROR CARTER: Yes.

THE COURT: Okay.

Is there anything about what he did while he was there or your seeing him that would cause you to think you could not be a fair juror in this case?

JUROR CARTER: Oh, no.

THE COURT: Okay.

Do any of the lawyers desire to ask Ms. Carter any questions?

MR. LOEVY: Not from plaintiff.

MS. KENDALL: I just have one question.

THE COURT: Sure.

MS. KENDALL: Or maybe two.

Ms. Carter, do you know approximately how many times you might have seen Mr. Coffie?

JUROR CARTER: Once.

MS. KENDALL: One time.

And was there anything about --

JUROR CARTER: I believe he was helping the seniors, you know, escort them to their cars and things when we was there.

MS. KENDALL: Did he help walk you to your car?

JUROR CARTER: No, he didn't help me, but the seniors that was with me, because I drove them down there.

MS. KENDALL: Which Hyatt was it?

JUROR CARTER: On Wacker Drive.

MS. KENDALL: Was there anything about your contact with Mr. Coffie or your observations of him which would make you think he was more credible or less credible?

JUROR CARTER: Repeat that.

MS. KENDALL: Sure.
When you have contact with people sometimes you form impressions about them as to whether they would be truthful or not truthful. Just through casual contact, you might find that they are very nice or very rude, a variety of things.

JUROR CARTER: Oh, he was very nice to the seniors.

MS. KENDALL: So is there anything about your contact with Mr. Coffie that might make you think he was more truthful or less truthful than somebody else?

JUROR CARTER: Oh, no.

MS. KENDALL: That's all I have.

THE COURT: Okay. Any other questions?

MR. LOEVY: No, your Honor.

THE COURT: All right. Ms. Carter, thank you very much. Sorry to detain you. You can take the water with you. It's free.
Have a pleasant weekend, and we will see you on Monday morning. Thank you. Tuesday morning. Tuesday morning. Don't come here on Monday. Thank you.

(Juror Carter exits.)

THE COURT: Okay.

MR. LOEVY: One thing, your Honor.

MS. KENDALL: Judge, could I make a record?

THE COURT: Sure. Go ahead.

MS. KENDALL: Defendants - - based on Ms. Carter's answers, defendants would ask that Ms. Carter be struck for cause. She does have an impression that, from her prior exposure to Mr. Coffie, that he is very nice. And I realize it was a very brief encounter, but we do think that all jurors should have no preconceptions whatsoever about any of the parties in this case.

THE COURT: All right. Any response?

MR. LOEVY: This is the only African-American juror, and I think that's a factor. And she did say that she can be fair. And I think that's the test.

THE COURT: All right. The challenge for cause to have the juror Gladious Carter removed from the jury at this time is denied.

MS. KENDALL: Thank you, Judge.

(Trial Tr. vol. 5, 233:12-238:4.)

Seven days after that, on October 12, 2007, at the beginning of the morning session:

THE COURT: All right. Good morning to all of you.
Are there any matters we need to take up before we bring in the jury?

MS. KENDALL: The defendants have one issue, Judge.

THE COURT: All right.

MS. KENDALL: With regards, again to Juror Gladious Carter –

THE COURT: Yes.

MS. KENDALL: – yesterday, we had the testimony of Malcolm Edwards, the friend of the plaintiff, who also works at the Hyatt hotel, which is where Ms. Carter remembered the plaintiff from. So we do think it might be appropriate to determine whether she knew him also from the Hyatt.

THE COURT: All right. Let's ask Ms. Carter to come into the courtroom.

THE CLERK: Okay.

THE COURT: While we are getting Ms. Carter, I have decided to continue to include the first two paragraphs on page 10.
I believe the jurors understand that they are going to be hearing this case next week or their responsibilities will not be done today. If they don't understand that, I don't think we should hide that from them, and I believe that this will not influence them.

If after the verdict, if we get one today, or maybe even at the end of the day, we can make an inquiry if anyone feels so burdened that it would distract them from being able to continue to be conscientious jurors, we can then discuss what we desire to do with that juror.

(Juror Carter in.)

THE COURT:  Good morning, Ms. Carter.

JUROR CARTER:  Good morning.

THE COURT:  We appreciate your coming in.
I was just wondering, just to make sure of this point, because we have to make sure that there is no outside consideration, yesterday there was an individual named Malcolm Edwards that testified.  Do you recall Mr. Edwards?

JUROR CARTER:  Yes.

THE COURT:  Okay.  He testified he is a security guard at the Hyatt as well, along with the plaintiff, along with Mr. Coffie.
And so let me just ask you, do you know Mr. Edwards at all?  Have you ever run into him at the Hyatt?

JUROR CARTER:  I think I saw him at the Hyatt when I went with the church.  We goes down there every year for a banquet.  That's the only way I would have saw him.

THE COURT:  Okay.  You think you saw him there?

JUROR CARTER:  Yeah.

THE COURT:  All right.  Let me just ask you, having seen him there, do you believe that will cause you to not be able to be a fair juror in this case?

JUROR CARTER:  Oh, no.

THE COURT:  Will you just because you saw him there  believe him more or believe him less because of that?

JUROR CARTER:  Oh, no.

THE COURT:  Okay.  All right.  Do counsel have any questions of Ms. Carter?

MR. LOEVY:  Not from the plaintiff, Your Honor.

THE COURT:  All right.

MS. KENDALL:  If I may just ask a few, Judge?

THE COURT:  Sure.

MS. KENDALL:  Ms. Carter, did you see Mr. Edwards do anything other than just stand there?  Did you see him interact with anybody or did you have any interaction with him at all?

JUROR CARTER:  No.

MS. KENDALL:  From what you saw of Mr. Edwards, were you able to form – did you form any impression of him or any opinion of him in any way?

JUROR CARTER:  No.  He just assists the seniors, you know, in and out of the – get them out of the car and in the car.

MS. KENDALL:  Okay.  So you saw him assisting the seniors –

JUROR CARTER:  Right.

MS. KENDALL:  – in and out of the car?

JUROR CARTER:  Right.

MS. KENDALL:  And from what you saw of him, did it appear to you that he was nice –

JUROR CARTER:  Oh, yeah, he was nice to us.

MS. KENDALL:  Okay.  And the fact that you formed an impression of him that he was nice, did that make you feel like you liked him in any way?

JUROR CARTER:  Oh, not really.

MS. KENDALL:  And you didn't form any impression –

JUROR CARTER:  Oh, no.

MS. KENDALL:  – as to whether he would be truthful or untruthful?

JUROR CARTER:  No.

MS. KENDALL:  And was Mr. Coffie helping him do this?

JUROR CARTER:  Well, they was all around in there, you know, assisting us.

MS. KENDALL:  Okay.  And at any time did you have any conversation with their Mr. Coffie or Mr. --

JUROR CARTER:  No.

MS. KENDALL:  – Edwards?  And did you only see Mr. Edwards one time or do you see him every year when you're at this –

JUROR CARTER:  That was the only time when I saw him.

MS. KENDALL:  I'm sorry?

JUROR CARTER:  That was the only time I saw him.

MS. KENDALL:  Okay.  Thank you.
Nothing further, Judge.

THE COURT:  All right.  Anything?

MR. LOEVY:  No, Your Honor, not from the plaintiff.

THE COURT:  Okay.  Ms. Carter, thank you very much.
As soon as everyone arrives and we address any further legal points, we will get on with the closing arguments, all right?

JUROR CARTER:  Okay.

THE COURT:  Thank you very much, Ms. Carter.  You may go back to the jury room.

(Juror Carter out.)

THE COURT:  All right.  Let me ask my clerk to check and see if all the jurors have arrived.

(Plaintiff in.)

THE COURT:  We were missing Mr. Devlin when I hit the bench moments ago.

MS. KENDALL:  Judge, if I could speak to Ms. Carter?

THE COURT:  Sure.

MS. KENDALL:  We would just like to renew our motion to strike her for cause because she does have not only an impression of the plaintiff as being nice, she also now has an impression of a witness for plaintiff who's also nice.  So she has a favorable impression of both the plaintiff and one of his witnesses.

Again, both parties are entitled to jurors who have no preconceptions whatsoever, and, you know, we think it's very possible if Ms. Carter had a negative impression of the plaintiff, that maybe she would not still be on the jury.

THE COURT:  If she had a negative impression of the plaintiff from an experience with the plaintiff, but she said she could still be fair, there would have to be a peremptory challenge as opposed to a challenge for cause, so I am not sure your analogy is apt.

But I will hear from the plaintiff on this point.

MR. LOEVY:  Well, Your Honor, I heard her.  I was listening carefully.  She said, "If I saw Malcolm Edwards, it would have been when I was at the Hyatt with the security guards."  So I think what this woman has is a memory of being at the Hyatt and seeing security guards.

And then there were some leading questions by counsel, and, you know, people will get led.  She said, "If it would have been at the Hyatt, I would have seen him there," and she hasn't – and, you know, people do bring things into the courtroom, but that's not the inquiry.  It's whether you can be fair, and she has been emphatic that she could be fair.

MS. KENDALL:  But this is a case that rises and falls, to a large extent, on credibility, and we do think that she had demonstrated an impression of the plaintiff, a favorable impression.

THE COURT:  And she has, in response to my question, my leading questions as well as your leading question, indicated that she would not believe the plaintiff more or less because of anything that she may be recalling.

And so she answered precisely the question with regard to credibility, that her prior contact, if there was a prior contact, which, of course, the plaintiff still doesn't remember or denies, doesn't –

MR. LOEVY:  He's certain he's never seen this woman in his life, or as certain as a person could be.

THE COURT:  Right.  And so the motion is denied.

All right.  She is the only African-American person on the jury, so – that's not the reason why, but I just want the record to reflect that.

Anything else we need to take up before we bring in the jury for argument?

(Trial Tr. Vol. 9, 3:10-10:5.)  Closing arguments to the jury then commenced.

Four days later, on October 16, 2007, immediately after the deliberating jury sent out a note that they had reached a verdict:

> MR. HALE: Just for the record, we wanted to preserve the record and make a formal motion for a mistrial based on the issue of the juror that we thought should have been stricken because of her acquaintance with the plaintiff.
>
> MR. PLATT: Gladious –
>
> THE COURT: Juror Gladious Carter?
>
> MR. HALE: Correct.
>
> THE COURT: Okay. All right. That, of course, is denied.
>
> MR. HALE: Thank you, Judge.
>
> THE COURT: She several times said that she was able to be fair, and it is actually the plaintiff's position that he didn't know her.
> Let's bring in the jury.

(Trial Tr. vol. 12, 20:10-23.)

The record is clear that Coffie never had any personal contact with Ms. Carter. Ms. Carter observed Coffie once when he was working as a security guard at the Hyatt on Wacker Drive. Ms. Carter observed plaintiff's witness, Malcolm Edwards, one time as well when he, Edwards, was also working with Coffie at the Hyatt.

Juror Carter credibly stated in response to both defense counsel's and my questions that she could be fair. There is no evidence that she could not be fair. She harbored no implied bias.

The primary case relied upon by Korhonen and Lodwich's counsel regarding "implied bias" is *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000). That case is entirely distinguishable. Implied bias results from the formation of a relationship over time between the juror and some party or entity. Working for 15 years in the United States Attorney's Office, the same office as the prosecuting attorneys – which was the circumstance in *Polichemi* – may create

an implied bias. Here the juror Gladious Carter saw Coffie and Coffie's witness Edwards one time performing their jobs at the Hyatt. Coffie was unaware of her. Ms. Carter was credible when she, in response to multiple inquiries, said she would be fair. There was no basis to strike Ms. Carter from the jury.

## IV. Testimony of Treating Physician Dr. Scott Yilk

Korhonen and Lodwich contend that I erred when I prohibited the emergency room physician, Dr. Scott Yilk, who initially examined Coffie's rectal injury, from opining under Federal Rule of Evidence 702 that Coffie's injury was not consistent with a screwdriver being inserted into his rectum. Dr. Yilk's observations of Coffie's injuries and Dr. Yilk's factually based opinions were admitted at the trial in the form of a videotaped deposition under Federal Rule of Evidence 701.

Federal Rule of Civil Procedure Rule 26(a)(2)(C) requires that disclosures concerning expert testimony under Rule 702 "be made at the times and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(C). A party that, without substantial justification, fails to disclose information as required by Rule 26(a)(2)(C) is not permitted to use the improperly disclosed information as evidence at trial unless the non-disclosure was harmless. Fed. R. Civ. P. 37(c)(1); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005). In this case, the parties do not dispute that Dr. Yilk's testimony concerning causation constitutes expert testimony under Rule 702 nor do they dispute that Korhonen and Lodwich failed to disclose their intent to elicit from Dr. Yilk his opinion concerning causation until after the period for expert discovery had closed. Consequently, the only issue is whether Korhonen and Lodwich's failure to disclose their intent to elicit Dr. Yilk's opinion testimony at the trial as to the issue of causation, which was beyond that allowed by Rule 701, was substantially justified or harmless. It was neither.

Various items of circumstantial evidence, such as the nature and extent of Coffie's injuries, were disputed by the parties at the trial. The defense's decision to attempt to convert a portion of Dr. Yilk's factual Rule 701 testimony regarding what he observed as the treating emergency room physician into expert opinion testimony, without providing the information required by Rule 26(a)(2)(C) or meeting the reliability requirements of subsections (1), (2), and (3) of Rule 702, placed Coffie's counsel at a prejudicial disadvantage. Moreover, there was no justification for Korhonen and Lodwich not providing the information. Even though Korhonen and Lodwich cited the commentary to 1993 Amendments to Federal Rule of Civil Procedure 26 in their post-trial motion to justify their failure to make the necessary disclosures, *see* Defs.' Mot. for New Trial at 9, Korhonen and Lodwich ignore the committee's commentary to the 2000 Amendments to Federal Rule of Evidence 701, which is directly on point.[2]

---

[2]The 2000 commentary states in pertinent part as follows:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See generally Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190 (3d Cir. 1995). By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson. *See* Joseph, *Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure*, 164 F.R.D. 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony" and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process"). *See also United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents testifying that the defendant's conduct was consistent with that of a drug trafficker could not testify as lay witnesses; to permit such testimony under Rule 701 "subverts the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E)").
>
> The amendment does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*. Certainly it is possible for the same

Korhonen and Lodwich contend that their failure to timely disclose their intent to elicit opinion testimony from Dr. Yilk concerning causation was harmless because Dr. Yilk opined at his deposition in November 2006 that Coffie's injuries were inconsistent with a screwdriver being inserted into his rectum. Indeed, Dr. Yilk expressed during his videotaped deposition that, based on his experience treating anal injuries in the emergency room and Coffie's description of how he received his injury, Dr. Yilk would have expected to see a tear or laceration to Coffie's anal sphincter on initial examination. Without proper compliance with the enumerated subsections of Rule 702, Dr. Yilk opined at his videotaped deposition that Coffie's injury did not appear to have been caused by a screwdriver. Prior to trial, however, Dr. Yilk signed an affidavit stating that he had limited experience performing proctoscope examinations and was not an expert on colorectal pathology. *See* Pl.'s Resp. to Defs.' Post-Trial Motion, Ex. E1. Consequently, by Dr. Yilk's own admission he was not an expert on the subject about which defendants sought to have him opine at trial. Therefore, my excluding Dr. Yilk's late-disclosed and insufficiently supported opinion on a subject he, himself, admitted he lacked expertise was not error.

Moreover, if excluding Dr. Yilk's opinion on this point were to be considered error, the error was harmless because Dr. Yilk's Rule 702 opinion was cumulative of other evidence presented at the trial. *See Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 480 (7th Cir. 2000);

---

witness to provide both lay and expert testimony in a single case. *See, e.g., United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents could testify that the defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where the agents testified on the basis of extensive experience that the defendant was using code words to refer to drug quantities and prices). The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

*Romero v. Cincinnati, Inc.*, 171 F.3d 1091, 1096 (7th Cir. 1999). In this case, Korhonen and Lodwich timely disclosed Dr. Gary Merlotti as an expert on causation and, unlike the disclosures Korhonen and Lodwich made regarding Dr. Yilk, disclosure of Dr. Merlotti complied with Federal Rule of Civil Procedure 26(a)(2) and this district court's standing order on pretrial procedures. *See* Fed. R. Civ. P. 26(a)(2); N.D. Ill. R. 16.1, Standing Order Establishing Pretrial Procedure, Documents Promulgated with the Standing Order, Final Pretrial Order n.7 ("only one expert witness on each subject for each party will be permitted to testify absent good cause shown"). Dr. Merlotti was called by the defense to provide his expert opinion testimony that Coffie's injuries were inconsistent with a screwdriver being inserted into his rectum (Trial Tr. vol. 6, 15:2-6) and testified at length on the issue (Trial Tr. vol 7, 191-297). Specifically, Dr. Merlotti testified:

> Q.    Now, you said earlier that you were asked to give an opinion regarding the etiology or cause of this particular tear; is that correct?
>
> A.    Yes. And, in particular, whether or not this is consistent with being searched with a screwdriver.
>
> Q.    Okay. And then what is your opinion with respect to whether or not this injury is consistent with being searched with a screwdriver?
>
> A.    My opinion is that it is virtually impossible to imagine this injury caused by a screwdriver.

(Trial Tr. vol. 7, 215:13-22.) Korhonen and Lodwich therefore were not prejudiced by my exclusion of Dr. Yilk's self-admitted, non-expert opinion testimony on the same issue inasmuch as Dr. Yilk's opinion testimony would merely have been cumulative of Dr. Merlotti's.

## V.  Coffie's Prior Arrest

Korhonen and Lodwich also argue that I erred when I granted Coffie's motion to bar evidence of his prior arrest. Specifically, Korhonen and Lodwich contend that they sought to introduce evidence of Coffie's arrest three weeks prior to the screwdriver incident to: (1) show that

Coffie lied when he "pled guilty to the arrest at issue even though he was not guilty . . . because three weeks before he was arrested under virtually identical circumstances"; (2) substantiate the anonymous tip that led to Korhonen and Lodwich stopping and searching Coffie; and (3) contradict Coffie's testimony that he was too scared and embarrassed to report his rectal injury to the medical personnel at Cook County Jail. Evidence of Coffie's prior arrest that did not lead to a conviction was excluded because the evidence was not admissible under the Federal Rules of Evidence [348]. Criminal convictions are admissible under Rule 609 to impeach a witness; arrests are not.

Rule 404(b) generally prohibits admission of evidence of prior bad acts or alleged crimes that did not result in conviction for the purpose of proving a person's character or the person's propensity to act in conformity with that character on a given occasion, unless the evidence bears on a relevant issue in the case, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. Fed. R. Evid. 404(b); *see United States v. Ross*, ___ F.3d ___, Nos. 05-2433 & 05-2703, 2007 WL 4355362, at *9 (7th Cir. Dec. 14, 2007); *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999). In considering whether to admit prior bad acts evidence, the court must balance the evidence's probative value against the danger of unfair prejudice, undue waste of time, and confusion of the issues under Rule 403. *See Ross*, 2007 WL 4355362, at *9; *Agushi*, 196 F.3d at 760.

Korhonen and Lodwich's reasons for seeking to introduce evidence of Coffie's prior arrest do not fall within the exceptions set forth in Rule 404(b). Korhonen and Lodwich's first ground for admission runs head-on into Rule 404(b)'s prohibition against prior bad acts evidence inasmuch as Korhonen and Lodwich sought to show that Coffie lied about possessing drugs on the day of the screwdriver incident by showing that he allegedly possessed drugs three weeks earlier. Use of prior bad acts evidence to show a person's propensity to act in a particular manner on a particular occasion

is prohibited under Rule 404(b). *Ross*, 2007 WL 4355362, at *9; *Agushi*, 196 F.3d at 760. Korhonen and Lodwich's second and third grounds for admission of Coffie's prior arrest are simply irrelevant to any issue in the case. Whether Korhonen and Lodwich had a sufficient reason to stop and search Coffie is not probative of whether they later performed an anal cavity search of Coffie by inserting a screwdriver into his rectum. Likewise, whether Coffie was "aware of the fact he would be receiving medical treatment at the jail" does not bear on whether Coffie was comfortable telling jail personnel that the defendant Chicago police officers had violated him with a screwdriver in an alley after arresting him.

VI. <u>Minimizing Unfair Prejudice by Using the Term "Illegal Drugs" as Opposed to "Heroin"</u>

Similarly, Korhonen and Lodwich argue that I erred when I granted Coffie's motion to bar the use of the word "heroin" from trial. They contend that because I based my decision to bar use of the word "heroin" on an "incorrect reading" of the statute under which Coffie was convicted, *see* 720 ILCS 570/402(c), my ruling is erroneous as a matter of law. Korhonen and Lodwich also argue that exclusion of the word "heroin" was prejudicial to them because evidence of the type of substance at issue in Coffie's arrest was (1) "significant in establishing that [Coffie] was, indeed, in the possession of drugs and that the defendants did not plant any drugs on him," and (2) "a necessary part of the whole story and corroborated the officers' version of the events."

As stated in the previous section of this opinion, a court, when deciding whether to admit or exclude evidence, must balance "the probative value of the evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *see United States v. Khan*, 508 F.3d 413, 417 (7th Cir. 2007). Here, I initially denied Coffie's motion to exclude use of the word "heroin" from trial [344], but on Coffie's motion to reconsider, I granted the motion. My reasoning was that I initially believed Coffie's state conviction had been specifically for possessing

heroin, and would have been disclosed when Korhonen and Lodwich used the conviction to impeach Coffie under Rule 609. The parties' briefing on the issue revealed, however, that Coffie had been convicted of possessing a controlled substance under 720 ILCS 570/402(c). (Ex. C., Plf.'s Motion to Reconsider Regarding Word "Heroin" [363].) Because Coffie was convicted of possessing a controlled substance and not of possessing heroin, specifically, the probative value of the type of illegal drug Coffie was convicted of possessing greatly diminished. In balancing probative value against unfair prejudice under Rule 403 it became clear to me that the danger of unfair prejudice that would result from use of the word "heroin" as opposed to "a controlled substance" at the trial substantially outweighed the probative value.

The primary issue in the case was whether the search of Coffie's rectum performed by Korhonen with a screwdriver was reasonable. In determining whether Korhonen's actions were reasonable, the jury was required to measure the reasonableness of the search based on the information Korhonen possessed at the time of the search. *See Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir. 1988). Under the facts introduced at the trial, Korhonen did not know the exact nature of the controlled substance that Coffie allegedly possessed at the time of Coffie's arrest and rectal search. Thus the jury was properly told that, according to Korhonen and Lodwich, before stopping Coffie they had received an anonymous tip that a person matching Coffie's physical description was transporting drugs and they had observed Coffie drop a bag of what Korhonen and Lodwich thought were illegal drugs when they stopped Coffie. Contrary to Korhonen and Lodwich's contentions, identification of the specific drug type possessed by Coffie is not probative regarding the issue of whether Coffie actually possessed drugs when he was stopped or whether Korhonen and Lodwich planted the drugs when they stopped him; that information was readily conveyed to the jury by the parties referring to "illegal drugs" or a "controlled substance." The fact that the controlled substance

possessed by Coffie was later identified as heroin was not a part of Korhonen and Lodwich's version of the events as they contended they knew them at the time Korhonen performed the rectal search of Coffie. Whether the controlled substance possessed by Coffie was heroin as opposed to, for example, marijuana adds no probative value to the issues presented in this trial. The danger of unfair prejudice was great because of the bias some jurors might have against a person who has been found possessing heroin, which carries with it a reputation for high abuse and addiction rates.

VII. <u>Pretrial Decision to Bifurcate Issues of Liability and Damage for Trial</u>

Finally, Korhonen and Lodwich argue that I erred in granting Coffie's motion to bifurcate the trial because bifurcation prevented them from eliciting evidence that Coffie did not seek psychological treatment following the screwdriver incident and suffers no ongoing mental disorders. According to Korhonen and Lodwich, Coffie's lack of psychological injury is "highly probative of whether [he] was ever actually assaulted as he claimed." I bifurcated the trial into a liability phase and a damages phase because the benefits of bifurcation outweighed the detriments [296].

A district court may, in its discretion, bifurcate claims or issues for trial if the bifurcation would prevent prejudice to a party or promote judicial economy. Fed. R. Civ. P. 42(b); *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007). If one of these criteria is met, the court may order bifurcation so long as doing so will not prejudice the non-moving party or violate the Seventh Amendment. *Chlopek*, 499 F.3d at 700. The parties do not dispute that bifurcation served the interest of judicial economy and did not result in a Seventh Amendment violation, so the only issue is whether Korhonen and Lodwich were prejudiced as a result of the bifurcation.

Korhonen and Lodwich have failed to establish that they were prejudiced by my decision to bifurcate the issues of liability and damages at the trial. Coffie points out in his response to Korhonen and Lodwich's motion for new trial that Korhonen and Lodwich never attempted to

introduce evidence of the severity (or lack thereof) of any psychological injury suffered by Coffie as a result of the screwdriver incident and therefore never gave me an opportunity to consider the admissibility of such evidence during the liability phase of the trial. *See Kasper v. St. Mary of Nazareth Hosp.*, 135 F.3d 1170, 1176 (7th Cir. 1998) (explaining that a litigant must give the district court a "fair chance to avoid error"). Korhonen and Lodwich do not dispute Coffie's contention nor do they direct my attention to any portion of the record where their attempt to admit evidence of psychological injury was denied. Korhonen and Lodwich also do not specify in their briefs what type of evidence (testimonial, medical records, etc.) they wished to offer or from whom such evidence would have been elicited. I allowed admission of ample evidence concerning the relatively minor nature of Coffie's physical injuries, cannot recall explicitly excluding evidence concerning Coffie's alleged lack of psychological injury, and will not scour the record, which consists of several hundred pages of pretrial motions and 12 volumes of trial transcripts, to find support for Korhonen and Lodwich's argument. *See Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006) (explaining that the district court is not required to "scour a record to locate evidence supporting a party's legal argument") (internal quotation marks and citation omitted). Any argument that Korhonen and Lodwich were prejudiced by my decision to bifurcate the trial because they were prevented from introducing evidence concerning Coffie's lack of psychological injury is based purely on speculation and is therefore waived.

VIII.   Defendants' Motion for Leave

Lawyers typically are not allowed to talk informally with jurors after the verdict has been returned. In this case, immediately after the jury delivered its verdict, plaintiff's counsel asked if I would permit counsel to talk to the jurors. The following colloquy occurred after plaintiff's counsel

suggested that counsel would be willing to stay in the courtroom to talk to the jurors because "both sides would be interested in hearing how their thought process was" (Trial Tr. vol. 12, 27:25-28:1):

> THE COURT: Okay. I only do it in the jury room.
>
> MR. LOEVY: Okay.
>
> THE COURT: I only allow the lawyers. No parties are allowed. I allow the jurors – in fact, you know what? Why don't we bring the jurors back in for just an encore.
> This jury has completed its service. I wouldn't allow this if it had not.
> Let me also say this, that both sides have to commit that nothing that is said in the jury room in this post-verdict discussion can be used in any way in filing any motions.
>
> MR. LOEVY: That's agreed from our side, Your Honor.
>
> MS. KENDALL: There's no problem with that, Judge.

(Trial Tr. vol. 12, 27:2-15.)

The jurors were then brought back into the courtroom, and I said the following to the jurors with counsel and the parties present:

> THE COURT: Thanks, folks. There was one other matter – or, actually, two other matters. One – please be seated. I am sorry.
> The case is over, so you can leave, if you want to, but there were two other matters.
> Number one, first of all, the lawyers would like to talk with you if you are willing to talk with them. The parameters are only in the jury room, only the lawyers. You can walk out any time you want to.
> The lawyers have agreed that nothing that is said in the course of these post-verdict discussions can be used in any way in the litigation. So nothing that you say – feel free to be frank. It is a rare opportunity for the lawyers to speak with jurors after a trial.
> I don't allow it unless the jurors have completed their jury service, and I leave it entirely up to you as individuals. You can go about your business from this point forward. There is no obligation.
> There is one other thing, though. I would like you to fill out these forms. If you don't want to talk to the lawyers, but I would like you to fill out these forms. The forms relate to the procedures that we followed in this case.
> We followed, as I told you at the beginning, and you may recall, some new procedures that are being tried by the judges in the federal courts of Indiana, Illinois, and Wisconsin.

(Trial Tr. vol. 27:21-28:21.)  Because all counsel agreed to these conditions and neither side objected, I trusted counsel to abide by the agreed-upon parameters I had articulated.  Defense counsel then violated my directive to talk with the jurors "only in the jury room" and now want to renege on their agreement "that nothing that is said in the course of these post-verdict discussions can be used in any way in the litigation."  (Trial Tr. vol. 12, 28:2-7.)

Defense counsel have abused this court's grant of permission.  The Seventh Circuit instructs that a district judge may, in the judge's discretion, set the parameters of post-verdict juror interviews and that exclusion of evidence obtained during unauthorized juror interviews is an appropriate sanction:

> Although we need not decide now what kind of showing should ordinarily move a district judge to allow post-verdict interviews of jurors, we endorse the idea that, local rules aside, permission of the trial judge should be sought and obtained before embarking on the pursuit.  The ground rules for inquiries of this sort–particularly as to things like time and place–are best left to a judge, not a hired "investigator" employed by a losing litigant.  We have previously noted with approval a district court's decision to exclude evidence from post-trial juror interviews obtained without leave of the court.

*Cuevas v. United States*, 317 F.3d 751, 753 (7th Cir. 2003) (internal citation omitted).  As reflected in the conditions that I imposed upon all counsel regarding the post-verdict juror interviews in this case, I gave counsel permission to speak with jurors post-verdict only in the jury room.  Defense counsel went beyond the scope of that permission by communicating with a juror outside the jury room.  Defense counsel now seek to use information acquired during a telephone call with a juror the day after the verdict was returned to overturn the jury's verdict.  Defense counsel's misconduct will not, and should not, be condoned or rewarded.  *See Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) (characterizing as "attorney misconduct" counsel's use of information obtained during juror interviews for purpose beyond scope of court's grant of permission).

In addition to waiving on the record the opportunity to raise issues resulting from their interviews of the jurors, defense counsel have presented to the court no actual evidence that "one of the jurors told defendants' counsel that another juror mentioned during jury deliberations a negative experience that juror had had with the Chicago police department." Defense counsel also have not identified the juror nor have they provided an affidavit of counsel or anyone else in support of the representations contained in their motion. Indeed, all that defense counsel have presented to this court in support of the motion are vague assertions about a juror's alleged misconduct. Plus, defense counsel have made no showing that the unidentified juror could not fairly evaluate the evidence and return a fair verdict. After all, defense counsel do not dispute the sufficiency of the evidence to support a verdict in favor of the plaintiff.

In addition, defense counsel argue in their motion for new trial that the unidentified "juror did not disclose this personal negative experience with the Chicago police department, despite defendants' counsel's specific request for such disclosure. During voir dire defense counsel, Mr. Platt, asked all the potential jurors: "Has any of you had any or do you know of anybody who has had any bad experience with police officers in general, either – not only yourself, but perhaps friends or relatives that you haven't told us about so far?" (Trial Tr. vol. 1-A, 123:6-9.) Only one juror responded to defense counsel's general question, and that juror was excused for cause unrelated to his contact with law enforcement.

Of those jurors that ultimately were empaneled, defense counsel questioned only one directly concerning the juror's past experiences with police officers, and that juror represented that his contact with law enforcement would not influence his ability to fairly weigh the facts of this case:

MR. PLATT: Mr. Janeliunas?

PROSPECTIVE JUROR JANELIUNAS: Yes.

MR. PLATT:  The friend that – you said you have a friend that was recently arrested, is that correct?

PROSPECTIVE JUROR JANELIUNAS:  Yes.

MR. PLATT:  Is he a close friend of yours?

PROSPECTIVE JUROR JANELIUNAS:  A close friend of my wife's more.

MR. PLATT:  And what police agency was he arrested from?

PROSPECTIVE JUROR JANELIUNAS:  Joliet.

MR. PLATT:  And were you – do you know anything about the circumstances of that arrest?

PROSPECTIVE JUROR JANELIUNAS:  No.  Just a friend of ours.  That's it.  A Joliet cop that told us that he was going to jail.

MS. REPORTER:  I'm sorry?

PROSPECTIVE JUROR JANELIUNAS:  A friend of ours.  It's a Joliet cop who told us that he was in jail and gave us some – what he knew about it.

MR. PLATT:  Does the arrest of your friend, has it affected you or your wife's thinking about the treatment that your friend or your wife's friend has had a problem with the police department?

PROSPECTIVE JUROR JANELIUNAS:  No.

(Trial Tr. 1-A, 131:14-132:13.)

In addition to Juror Janeliunas, four other jurors who were also ultimately empaneled each stated in response to the voir dire questions I posed to them regarding whether they or their family members had had contact with law enforcement that they could be fair jurors in this case:

PROSPECTIVE JUROR HOELSCHER:  Under 13,[3] my father was on the Police & Fire Commission of our town for a number of years, and that's about the

_____

[3]Each prospective juror during voir dire was provided with a sheet entitled "Juror Biographical Questions."  Question 13 on the sheet asked, "Have you or any close friend or relative ever been associated with or employed by any police department or law enforcement agency?"

only connection with law enforcement, other than having administered a collective bargaining agreement for the police officers at the county hospital when I was there. I had that contract, which was a Teamster contract.

THE COURT: All right. That covers 13, then?

PROSPECTIVE JUROR HOELSCHER: I think, I think it does.

THE COURT: All right. Number 14?[4]

PROSPECTIVE JUROR HOELSCHER: I was – I've been – I was arrested back in the '80s for reckless driving in Huntley, Illinois --

THE COURT: Okay.

PROSPECTIVE JUROR HOELSCHER: – and I don't know if that counts or not. But that was in the very early '80s and never since.

THE COURT: All right. Well, and what happened in that case?

PROSPECTIVE JUROR HOELSCHER: I pleaded guilty to reckless driving.

THE COURT: And you paid a fine?

PROSPECTIVE JUROR HOELSCHER: I did pay a fine, yes, I did.

THE COURT: Okay. And is there anything about that experience that would cause you to believe you couldn't be a fair juror here?

PROSPECTIVE JUROR HOELSCHER: Absolutely not, no.

(Trial Tr. vol. 1-A, 64:5-65:8.)

My voir dire questioning of another juror, Sharon Johnson, on this point was as follows:

THE COURT: All right. Number 11?[5]

PROSPECTIVE JUROR JOHNSON: Do DUIs count? I have had several relatives that have been charged with DUI.

---

[4]On the "Juror Biographical Questions" sheet, question 14 asked, "Have you or any close friend or relative ever been arrested or charged with a crime?"

[5]On the "Juror Biographical Questions" sheet, question 11 asked, "Have you or any close friend or relative ever been a plaintiff, defendant or witness in any case?"

THE COURT: Okay. Well, let me – yes, let me ask you about that. Is your relatives' experience with the DUIs, is there anything about those experiences that they've related to you that would cause you to believe you could not be a fair juror in this case?

PROSPECTIVE JUROR JOHNSON: No.

(Trial Tr. vol. 1-A, 67:16-24.)

My voir dire questioning of another juror, Joseph Devlin, on this point was as follows:

PROSPECTIVE JUROR DEVLIN: . . . I've got a cousin that is a detective for the Chicago Police Department.
No to 14, no to 15.[6]

THE COURT: All right. Let me just go back to your cousin who is a detective on the Chicago Police Department.
Is there anything that your cousin has said about your cousin's work that would cause you to believe that you could not be a fair juror in this case?

PROSPECTIVE JUROR DEVLIN: No.

(Trial Tr. vol. 1-A, 85:15-23.)

I also inquired of juror Dolores Mahoney on this point:

PROSPECTIVE JUROR MAHONEY: My father has had several DUIs, but that was many years ago.

THE COURT: Okay. Is there anything about those experiences that would cause you to believe you could not be fair?

PROSPECTIVE JUROR MAHONEY: No, sir.

(Trial Tr. vol. 1-A, 99:3-8.) Despite having a full opportunity to question the prospective jurors, defense counsel did not ask any follow up questions directly to these jurors. Accordingly, defense counsels' motion for leave to submit evidence of juror dishonesty is denied based upon defense counsels' conduct that was contrary to the court's explicit post-verdict directive. Moreover, any

---

[6]On the "Juror Biographical Questions" sheet, question 15 asked, "Have you or any close friend or relative ever been the victim of a crime?"

objections defense counsel had on this point were waived by defense counsels' failure to explore the point further during voir dire despite being given the opportunity to do so.

## IX.  CONCLUSION

For the foregoing reasons, Defendants Korhonen and Lodwich have failed to show errors substantial enough to have denied them a fair trial.  The verdict of the jury should stand.  A new trial is not warranted.  Accordingly, Defendants' Motion for a New Trial and For Leave to Submit Evidence of Juror Dishonesty During Voir Dire [393] is denied.

ENTER:

_James F. Holderman_

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date:  January 16, 2008